UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x

DIANE SHANAHAN, RAYMOND GREEN, and LESTER PEARSALL,

Plaintiffs,

v.

TOWN OF HUNTINGTON, HUNTINGTON TOWN SUPERVISOR EDMUND J. SMYTH, KEVIN S. ORELLI, SEAN CAVANAGH, and LISA BAISLEY,

Defendants.

---------------------------------------------------x

**MEMORANDUM AND ORDER**
21-CV-7106 (RPK) (JMW)

RACHEL P. KOVNER, United States District Judge:

Plaintiffs Raymond Green, Lester Pearsall, and Diane Shanahan, longtime employees of the Town of Huntington, filed this lawsuit principally alleging that they were denied promotions by the Town and its officials on the basis of race. Defendants now move for summary judgment. For the reasons set forth below, the motion is granted.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 statements or relevant portions of the record and are undisputed unless otherwise noted.

Green and Pearsall are African American men and Shanahan is an African American woman. Defs.' Rule 56.1 Statement ("Defs.' Statement") ¶¶ 47, 59 (Dkt. #70-1). All three began working for the Town of Huntington in the 1980s and worked for at least part of their career in the Town's Highway Department. *Id.* ¶¶ 69–70, 113, 139.

## I. Promotion Decisions in 2019

Between 2018 and 2021, the Highway Department was supervised by defendant Kevin S. Orelli, whose title was Highway Superintendent. *Id.* ¶¶ 15, 17, 19. The Department's chain of command also included defendant Thomas Cavanagh, whose title was Deputy Highway Superintendent, *id.* ¶ 188, and four levels of labor crew leaders ("LCLs"), *id.* ¶¶ 20–28. The seniority of each LCL level was denoted by a number. The lowest level, LCL-1, was made up of "lower level forem[e]n." *Id.* ¶ 21. The next level up was LCL-2. *Id.* ¶ 22. The next level up was LCL-3, and there were only three people at this level, each of whom supervised a Highway Department yard. *Id.* ¶¶ 23–25. The highest level was LCL-4, and there was only one person at this level, who "worked directly with the Highway Superintendent and was considered the director of operations" of the department. *Id.* ¶¶ 26–28.

Around August 2019, the LCL-4 position and one of the LCL-3 positions became vacant. *Id.* ¶ 58. Orelli, who was in charge of filling those positions, testified that his "criteria" for the LCL-4 position included finding "the most enthusiastic, most willing[,] and the most knowledgeable person in the department," "someone who had leadership skills and . . . the guy that I would call in the middle of the night preparing for a snowstorm." Mem. in Opp'n to Summ. J. Ex. E ("Ex. E") 26 (Dkt. #72-7); *see* Defs.' Statement ¶ 19. Orelli also said he was looking for someone "not afraid to discipline another employee," because "many of the foremen at the Town of Huntington were very reluctant to" do that. Ex. E. at 35.

The Town of Huntington's collective bargaining agreement with Local 342, which governed promotions in the Highway Department, *see* Defs.' Statement ¶ 6, contained the following guideline:

> Based upon the EMPLOYER'S determination of fitness and ability the senior employee within the department may have the opportunity for promotion. The

> senior employee for the purpose of this provision shall be the employee with the greatest length of service in the classification next lower in rank from which the promotion is sought.

Mot. for Summ. J. Ex. B ("Ex. B") 18 (Dkt. 73-1). Orelli testified, however, that although "the union encouraged promotions based on seniority," he "disagreed with that method" and did not use it when making promotion decisions. Ex. E at 27. He explained that "if you hire people based on seniority, they have no incentive to actually do anything other than show up for work and go home at 3:30 . . . [w]hereas . . . if you promote people based on merit, then they are encouraged to actually excel at their job and show they care." *Id.* at 94. For that reason, his promotion decisions were "all about skill." *Id.* at 95.

At the time the LCL-3 and LCL-4 positions became vacant, Green was in an LCL-3 position, Shanahan was in an LCL-2 position, and Pearsall was in a position titled Heavy Equipment Operator ("HEO") -2. Defs.' Statement ¶¶ 47, 99, 117, 141. Green and Shanahan applied for the open LCL-4 position, and Pearsall applied for both open positions. Mot. for Summ. J. Ex. F ("Ex. F") at 18–21, 49–52, 67–70 (Dkt. #73-5) (PDF pagination). Defendant Sean Cavanagh, who is white and was in an LCL-2 position (and was Thomas Cavanagh's son), applied for the LCL-4 position. Defs.' Statement ¶¶ 54, 87; Pls.' Rule 56.1 Counterstatement ("Pls.' Statement") ¶ 31 (Dkt. #72-1, second part). Daniel Vaughn, who is African American and was in an LCL-2 position, applied for the LCL-3 position. Defs.' Statement ¶ 86.

The hiring process included both a written application and a set of interviews, at which the interviewers assigned each applicant a score out of ten. *See generally* Mot. for Summ. J. Ex. H ("Ex. H") (Dkt. #73-7) (PDF pagination) ("preliminary interview" notes); Ex. F (written applications and additional interview notes). Cavanagh received higher interview scores across the board than plaintiffs, and Vaughn received higher scores across the board than Pearsall. Ex. F

at 92–97 (Cavanagh), 18–21 (Green), 49–52 (Pearsall), 67–70 (Shanahan), 79–82 (Vaughn), 110–12 (Vaughn); Ex. H at 3 (Cavanagh), 7 (Green), 14 (Pearsall), 16 (Shanahan), 18 (Vaughn); Defs.' Statement ¶ 64. Cavanagh and Vaughn were ultimately chosen for the promotions, while plaintiffs were not. *Id.* ¶¶ 86–87. The tables below list the position, race, scores, and promotion outcome of each relevant applicant.

**Partial List of Applicants for the LCL-4 Position**

| Applicant | Position | Race | All Interview Scores | Average Interview Score | Promoted to LCL-4? |
|---|---|---|---|---|---|
| Sean Cavanagh | LCL-2 | White | 9, 9, 9, 9 | 9 | Yes |
| Raymond Green | LCL-3 | African American | 7, 8, 8, 8 | 7.75 | No |
| Lester Pearsall | HEO-2 | African American | 1, 2, 1, 2 | 1.5 | No |
| Diane Shanahan | LCL-2 | African American | 4, 5, 5, 6 | 5 | No |

**Partial List of Applicants for the LCL-3 Position**

| Applicant | Position | Race | All Interview Scores | Average Interview Score | Promoted to LCL-3? |
|---|---|---|---|---|---|
| Lester Pearsall | HEO-2 | African American | 1, 2, 1, 2 | 1.5 | No |
| Daniel Vaughn | LCL-2 | African American | 7, 7, 8, 8, 9, 9 | 8 | Yes |

## II. Grievances and Complaints in 2019

In June 2019, a few months before Pearsall was rejected for the LCL-3 and LCL-4 positions, he sent an email to elected officials in the Town of Huntington complaining about what he believed to be a pattern of discrimination and retaliation in the Highway Department's promotion decisions. Mem. in Opp'n to Summ. J. Ex. R ("Ex. R") 1 (Dkt. #72-20). The email's recipients included defendant Edmund J. Smyth, who at that time was a Huntington Town Councilman. *Ibid.*; Defs.' Statement ¶ 185. In the email, Pearsall said that "[d]espite[] being capable and having seniority in the necessary areas[,] I am continually denied the opportunity to move up in class." Ex. R. at 1. According to Pearsall, his email was passed along to an attorney for the Town, who ultimately decided to take no action. Second Am. Compl. ("SAC") ¶¶ 181–84 (Dkt. #22).

In December 2019, after Shanahan was rejected for the LCL-4 position, she filed a grievance with Local 342. Mot. for Summ. J. Ex. K ("Ex. K") 1 (Dkt. #77). Her grievance form stated that she did not "want to believe" her rejection was "due to nepotism or favoritism or anything against my age, women or black women, however . . . I deserve to be Labor Crew Leader IV because these opportunities only come[] once in a while." *Ibid.* Shanahan's grievance was denied in February 2020 in a letter issued by defendant Lisa Baisley, the Town of Huntington's "Grievance Officer." Defs.' Statement ¶ 110.

On December 23, 2021, Green, Pearsall, and Shanahan filed this action. *See* Compl. (Dkt. #1).

## III. Promotion Decisions in 2021 and 2022

The Town of Huntington's collective bargaining agreement with Local 342 also provided rules governing "temporary transfers." Ex. B. at 19. During a temporary transfer, an employee "work[ed] in a higher title on a temporary basis." *Ibid.* The agreement provided that:

> The senior EMPLOYER, based upon the EMPLOYER'S determination as to fitness and ability, will have the opportunity to work temporarily in the higher grade whenever a temporary vacancy occurs. Employment in a higher grade temporarily shall not be construed as giving any right to the senior employee to promotion.

*Ibid.* Plaintiffs and defendants agree that the reference to "senior EMPLOYER" in the first sentence of this provision actually means "senior EMPLOYEE." Defs.' Statement ¶ 207; Pls.' Resp. to Defs.' Rule 56.1 Statement ("Pls.' Response") ¶ 207 (Dkt. #72-1, first part).

At some point in 2021, a vacancy arose in an LCL-2 position in the Highway Department's Oakwood Yard. *See* Defs.' Statement ¶ 206; SAC ¶ 196; Mem. in Supp. of Summ. J. 27 (Dkt. #70); Mem. in Opp'n to Summ. J. 21 (Dkt. #72). On December 29, 2021—after this lawsuit had been filed—Pearsall, who was still classified as an HEO-2, began working "out of class" in the vacant LCL-2 position pursuant to a temporary transfer. Defs.' Statement ¶ 206; *see* Mem. in

Supp. 27; Mem. in Opp'n 21–22; Mot. for Summ. J. Ex. O ("Ex. O") 136–38 (Dkt. #73-13). During the temporary transfer, he was paid the LCL-2 salary. Ex. O at 137. According to Pearsall, two other African American employees were soon transferred to the Oakwood Yard as well, and one of them took over from Pearsall in the LCL-2 role. SAC ¶¶ 197–99; Mem. in Opp'n 21–22; Ex. O at 137–40. Pearsall's temporary transfer then ended on March 21, 2022. Defs.' Statement ¶ 206.

In early 2022, the Highway Department's LCL-4 position became vacant. *See ibid.* Green, who until that point had been classified as an LCL-3, assumed the vacant LCL-4 position and worked in it for approximately thirty days before returning to his LCL-3 role. *Ibid.* The parties dispute the nature of that assignment. According to defendants, Green was working "out of class" in the LCL-4 position pursuant to a temporary transfer. Defs.' Response ¶¶ 32, 49; Mem. in Supp. 27–28. Andre Sorrentino, who took over from Kevin Orelli as Highway Superintendent in 2022, Defs.' Statement ¶ 14, testified:

> At my direction, Green . . . temporarily worked in the LCL-4 position. Green's performance in the LCL-4 position was unsatisfactory. I never interviewed Mr. Green or any other employee to permanently fill the LCL-4 position. Based upon the operational needs of the Highway Department, as well as budgetary constraints, I decided not to fill the LCL-4 position.

Mem. in Supp. 27–28. Plaintiffs' version of events is different. According to plaintiffs, the vacant LCL-4 position was "posted" in February 2022 and Green "applied for" it and was selected by Sorrentino to fill the role on a permanent basis. SAC ¶¶ 122–23; *see* Mot. for Summ. J. Ex. M ("Ex. M") 170–71 (Dkt. #73-11); Mem. in Opp'n 23. While he filled the role, he was paid the LCL-4 salary. Ex. M. at 170, 172. Green believes, on the basis of information shared with him by others, that he was removed from the LCL-4 role after thirty days because Baisley, Smyth, and an attorney for the Town of Huntington opposed his promotion. SAC ¶¶ 124, 130; Pls.' Response

¶ 187; Pls.' Statement ¶¶ 32, 49. Baisley and Smyth both deny being involved. Defs.' Statement ¶ 162 (quoting Baisley that she was "not directly involved"); *id.* ¶ 187 (quoting Smyth that he "had no role").

According to plaintiffs, Shanahan also applied for the vacant LCL-4 position at the time it was posted in February 2022, but was not selected for it. SAC ¶ 53; Mem. in Opp'n 19–20.

## IV. This Lawsuit

When plaintiffs filed this action, they named the Town of Huntingtown and five individuals as defendants: Sean Cavanagh, Thomas Cavanagh, Lisa Baisley, Kevin S. Orelli, and Edmund J. Smyth. *See* Compl.* They amended their complaint twice to add, among other things, a claim that they were retaliated against for filing this lawsuit. *See* Compl.; Am. Compl. (Dkt. #13); SAC. Their second amended complaint ("SAC") asserted five counts: (1) discrimination by all defendants in violation of Title VI of the Civil Rights Act of 1964, SAC ¶¶ 210–16; (2) discrimination and retaliation by the individual defendants in violation of the Fourteenth Amendment via 42 U.S.C. § 1983, SAC ¶¶ 217–29; (3) discrimination by the Town in violation of the Fourteenth Amendment via Section 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), SAC ¶¶ 230–39; (4) unlawful disclosure of medical information by Sean Cavanagh and the Town, *id.* ¶¶ 240–45; and (5) defamation by Orelli, *id.* ¶¶ 246–56. Plaintiffs then withdrew Count One, which the Court dismissed without prejudice. The Court granted defendants' motion to dismiss Counts Four and Five with prejudice. *See* Sep. 25, 2024 Memorandum & Order 10 (Dkt. #51); *Shanahan v. Town of Huntington*, 750 F. Supp. 3d 7, 15 (E.D.N.Y. 2024).

* After this action was filed, Thomas Cavanagh died and Sean Cavanagh, who is the executor of his estate, was substituted for him. *See* Sep. 26, 2023 Order. Sean Cavanagh is now a defendant in both his individual capacity and in his capacity as executor of Thomas Cavanagh's estate. Although he is a defendant in two capacities, he is listed only once in the case caption.

Defendants now move for summary judgment on all remaining claims. *See* Mem. in Supp. In response, plaintiffs oppose summary judgment, and Green also seeks to introduce a hostile-work-environment claim against Orelli and Thomas Cavanagh under Title VII of the Civil Rights Act of 1964. *See* Mem. in Opp'n 1, 25–26.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (citation and quotation marks omitted). "A fact is material if it might affect the outcome of the suit under governing law." *Ibid.* (citation and quotation marks omitted). In determining whether there is a genuine issue of material fact, a court evaluates the whole record, resolving all ambiguities and drawing all reasonable factual inferences in favor of the non-movant. *See ibid.* A nonmoving party can survive summary judgment only if there is sufficient evidence to permit a rational trier of fact to find in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

## DISCUSSION

The motion for summary judgment is granted.

### I. Individual Defendants

The individual defendants are entitled to summary judgment on the failure-to-promote and retaliation claims because age discrimination is not prohibited by the Fourteenth Amendment and because no reasonable jury could find that defendants failed to promote plaintiffs on the basis of race, color, or gender, or that they retaliated against plaintiffs for filing grievances or complaints.

The Court declines to consider the hostile-work-environment claim because plaintiffs raised it for the first time in opposition to summary judgment.

**A. Failure to Promote**

All three plaintiffs allege that the individual defendants failed to promote them on the basis of race and color in violation of the Fourteenth Amendment via 42 U.S.C. § 1983, and Shanahan also alleges that they failed to promote her on the basis of gender and age. The individual defendants are entitled to summary judgment on those claims.

Plaintiffs' brief in opposition to summary judgment focuses on the 2019 hiring process for the vacant LCL-3 and LCL-4 positions. *See* Mem. in Opp'n 8–17. To the extent defendants failed to promote plaintiffs on other occasions, plaintiffs have abandoned their claims as to those occasions. *See Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*, 716 F. App'x 5, 14 (2d Cir. 2017) ("Where a partial response to a motion [for summary judgment] is made—*i.e.*, referencing some claims or defenses but not others . . . in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."). Any claims that arose prior to December 23, 2018 are also barred by the applicable statute of limitations. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) ("The statute of limitations applicable to claims brought under [Section] 1983 in New York is three years."); Compl. (filed December 23, 2021).

Courts evaluate failure-to-promote claims brought under the Fourteenth Amendment using the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015); *Emengo v. Stark*, 774 F. App'x 26, 29 (2d Cir. 2019). Under the *McDonnell-Douglas* framework, "the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination."

*Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802–04). To satisfy this burden at the summary judgment stage, a plaintiff must adduce evidence that he "(1) is a member of a protected class; (2) was qualified for the position at issue; (3) was denied the position; and (4) that the circumstances of the adverse employment decision give rise to an inference of discrimination." *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003). Next, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the [plaintiff's] rejection." *Burdine*, 450 U.S. at 253 (citation omitted). If defendant successfully does so, the burden returns to the plaintiff, who must proffer evidence from which a reasonable jury could find "by a preponderance of evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Ibid.*

**1. Claims Against Baisley, Sean Cavanagh, Thomas Cavanagh, and Smyth**

Initially, the failure-to-promote claims against Baisley, Sean Cavanagh, Thomas Cavanagh, and Smyth fail because there is no evidence those defendants were involved in the 2019 hiring process for the vacant LCL-3 and LCL-4 positions. In a Section 1983 suit, a plaintiff must "prove that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 612 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). According to Orelli, he "alone," as Highway Superintendent, "had the ability or right to fill any position" in the Highway Department." Defs.' Statement ¶ 19 (quoting Ex. E at 92); *accord* Mem. in Opp'n 34 ("Orelli . . . had full discretion to determine who would be promoted."). Although plaintiffs argue that Baisley sometimes "would participate in interviews, ask questions and provide input as to her thoughts on who would be promoted," Pls.' Response ¶ 159, they do not allege that Baisley participated in that way in the

2019 hiring process. Nor do the written interview records suggest that Baisley participated. *See generally* Ex. F; Ex. H; Mem. in Supp. of Summ. J. Ex. I (Dkt. #73-8); Mem. in Opp'n to Summ. J. Ex. I (Dkt. #72-11); *id.* Ex. K (Dkt. #72-13); *id.* Ex. L (Dkt. #72-14). Plaintiffs point exclusively to actions taken by Orelli, and not to actions taken by the other individual defendants, when discussing the decisions not to promote them in 2019. *See* Mem in Opp'n 8–17. In short, no reasonable jury could conclude that the individual defendants other than Orelli failed to promote plaintiffs.

**2. Claims Against Orelli**

While there is no dispute that Orelli was involved in the promotion decisions that plaintiffs challenge, Orelli is entitled to summary judgment on plaintiffs' failure-to-promote claims. Several claims fail at the first step. Orelli is entitled to summary judgment on Shanahan's claim of discrimination on the basis of age because "age is not a suspect classification" protected by the Fourteenth Amendment. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000). And Orelli is entitled to summary judgment on Pearsall's challenge to Orelli's failure to promote him to the LCL-3 position because he has not established a *prima facie* case with respect to that claim. Vaughn, who was promoted to that position instead of Pearsall, is also African American, undercutting any inference that Pearsall was not selected because of his race. "Where no other evidence giving rise to an inference of discrimination has been presented, the fact that a plaintiff is replaced with an individual within his protected class undermines his attempt to establish a *prima facie* case of discrimination." *Johnson v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 314, 323 (E.D.N.Y. 2014) (citation and brackets omitted); *see Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 319 (E.D.N.Y. 2014) (noting that courts "draw an inference against discrimination" in that circumstance). Pearsall's only argument is that he was "as qualified" for the LCL-3 position as Vaughn. *See* Mem. in Opp'n 10–11. Since the two men are members of the same protected class,

that assertion is insufficient, on its own, to raise an inference that Vaughn's selection was an act of discrimination.

Assuming that plaintiffs have established a *prima facie* case for their other claims against Orelli, which assert discrimination on the basis of race, color, and gender as to the LCL-4 position, those claims fail because plaintiffs cannot show that Orelli's reasons for promoting Sean Cavanagh instead of them are pretextual.

At the second step of the *McDonnell-Douglas* analysis, Orelli has carried his burden of articulating "legitimate, non-discriminatory reason[s]," *Burdine*, 450 U.S. at 253, for promoting Sean Cavanagh instead of plaintiffs. Orelli says he promoted Sean Cavanagh because of his impression that Sean Cavanagh "was a very hard worker, very dedicated worker, very knowledgeable worker" and that Sean Cavanagh would "not [be] afraid to discipline another employee," and also because Sean Cavanagh "did exceptionally well on his interview process." Ex. E at 35–36. Sean Cavanagh's personnel filed contained certificates of attendance from two leadership training courses and at least one additional training course, which Orelli says demonstrated Sean Cavanagh's "willingness and enthusiasm for his job and . . . job-related knowledge." Mem. in Supp. 11 (emphasis removed); *see* Mem. in Supp. of Summ. J. Ex. Y ("Ex. Y") (Dkt. #74-9) (containing certificates from "Management & Leadership Skills for First Time Managers," "Dealing Effectively with Unacceptable Employee Behavior," and "Asphalt Paving Principles"). His personnel file also contained seven letters praising his work. Mem. in Supp. 11; *see* Ex. Y. Additionally, Sean Cavanagh had experience filling in as an LCL-4 for approximately six months on a prior occasion, which Orelli says demonstrated Sean Cavanagh's "leadership skills" and "experience." Mem. in Supp. 11; *see* Defs.' Statement ¶ 171.

By contrast, Orelli says he decided not to promote plaintiffs because:

> I was not happy with Mr. Green. . . . Mr. Green could be difficult. He seemed to know more about what I was supposed to than what he was supposed to do. . . . [Green] would tell me that I couldn't do this or I couldn't do that and I should be coming to work earlier and I shouldn't play golf and [Green] had a very opinionated way of doing things.
>
> I was not impressed with [Shanahan] as far as, you know, being a self-starter type of a person. She wasn't someone what I would say was inspirational in any way. I was not overly impressed with [Shanahan]. I liked her as a person and I had no issues with her, but she wasn't exactly a star in the department, let's put it that way. . . . I think [in terms of enthusiasm for the job] she was just an average employee. . . . She didn't distinguish herself in any way.
>
> I like [Pearsall]. . . . The only reason that [Pearsall] did not get promoted was because someone else did get promoted.

Ex. E at 40–41 (Pearsall), 44–45 (Shanahan), 50–51 (Green). Plaintiffs did not have experience filling in as an LCL-4 for six months, Defs.' Statement ¶ 171, and their personnel files did not contain any letters praising their work or evidence that they attended training courses, *see* Mem. in Supp. of Summ. J. Ex. Z ("Ex. Z") (Dkt. #74-10) (Shanahan's file); *id.* Ex. AA ("Ex. AA") (Dkt. #74-11) (Green's file). Plaintiffs also had deficiencies in their employment records that Orelli found relevant. *See* Mem. in Supp. 11. For example, Green was once suspended for fifteen days for refusing to follow a supervisor's order, Defs.' Statement ¶ 127; Shanahan failed a civil service examination, *id.* ¶¶ 97, 101; and Pearsall received twelve warnings about taking excessive sick time between 2000 and 2017, resulting eventually in a suspension and a year and a half on "the abusive sick list," *id.* ¶¶ 152–53.

Orelli also points out that plaintiffs performed worse than Sean Cavanagh in their interviews. *See* Mem. in Supp. 12. Sean Cavanagh received an average interview score of 9, while Green's average was 7.75, Shanahan's was 5, and Pearsall's was 1.5. *See* Ex. F at 92–97, 18–21, 49–52, 67–70; Ex. H at 3, 7, 14, 16. That divergence in interview scores is supported at least in part by notes taken by the interviewers. The notes from Green's preliminary interview state, for

example, "APPLICANT DISPLAYED A DEFENSIVE ENERGY." Ex. H at 7 (emphasis original). The notes add "When asked a sidebar question of 'What do you think the hardest part of the [LCL 4] job would be?', [Green] responded with; 'How am I supposed to know? I don't do that job? How can you ask someone to answer that if they don't have that job?'" *Ibid.* Additionally, the interview notes point out that Green, Pearsall, and Shanahan did not provide their resumes, whereas Sean Cavanagh did provide his resume and also sent thank-you emails. *Id.* at 3, 7, 14, 16.

Those reasons, which include personality traits, knowledge, skills, experience, job performance, and interview performance, are legitimate and non-discriminatory. *See, e.g.*, *Moy v. Perez*, 712 F. App'x 38, 41 (2d Cir. 2017) (affirming that "the superior interpersonal skills and performance history of . . . the selected employee" were "legitimate, non-discriminatory reason for not promoting [plaintiff]"); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 104 (2d Cir. 2001) ("[T]here is nothing unlawful about an employer's basing its hiring decisions on subjective criteria, such as the impression an individual makes during an interview." (citation omitted)); *see also, e.g.*, *Gonzalez v. City of New York*, 442 F. Supp. 3d 665, 688–89 (S.D.N.Y. 2020) ("Defendants have carried [their] burden by submitting evidence showing that [plaintiff] was not promoted because [he] performed poorly at his interview and seemed unprepared for the job.").

Plaintiffs have not put forward evidence to rebut Orelli's proffered reasons at the final step of the *McDonnell-Douglas* analysis. To carry their burden, plaintiffs "must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Naumovski v. Norris*, 934 F.3d 200, 215 (2d Cir. 2019). "In effect," their "credentials would have to be so superior to the credentials of the person selected for the job that

'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff[s] for the job in question.'" *Byrnie*, 243 F.3d at 103 (citation omitted).

Plaintiffs argue primarily that Orelli's proffered reasons for promoting Sean Cavanagh are insufficient because Green and Shanahan were "next in line" for the LCL-4 position and Sean Cavanagh was chosen "out of order." SAC ¶ 26; *see* Mem. in Opp'n 8–11. But it is uncontested that Orelli did not consider seniority during the hiring process. Pls.' Response ¶ 64. And although plaintiffs assert that Orelli's refusal to consider seniority violated "the established policies outlined in the collective bargaining agreement," *ibid.*, that agreement provided only that seniority "may" be relevant to the hiring process, not that it must be, Ex. B at 18; *see Martinez v. City of Stamford*, No. 22-702, 2023 WL 3162131, at *3 (2d Cir. 2023) (summary order) (rejecting a claim that "failure to adhere to" a hiring policy was discriminatory where "the policy . . . is an example of a measure that a department 'may' adopt"). Accordingly, no reasonable jury could conclude that Green and Shanahan's alleged seniority over Sean Cavanagh renders Orelli's reasons for promoting Sean Cavanagh false or inadequate.

Plaintiffs also seek to discount the relevance of interview scores by asserting that Shanahan's and Green's interviews lasted only five or ten minutes each and were conducted by low-level employees rather than by Orelli himself. SAC ¶¶ 53, 81; Pls.' Response ¶ 48; Pls.' Statement ¶ 30; Mem in Opp'n 10. The record does not contain any statements about the length of Sean Cavanagh's interview. But Shanahan, Green, and Sean Cavanagh's preliminary interviews were conducted by the same employees, and the notes from those interviews are approximately the same length. *Compare* Ex. F at 7 (Green's interview notes scored by Keith Barrett and Stephen Jimenez), *and id.* at 16 (Shanahan's interview notes scored by Barrett and Jimenez), *with id.* at 3 (Sean Cavanagh's interview notes scored by Barrett and Jimenez). Although interviews almost

always involve subjective assessment, "no inference of discrimination can be drawn" where an employer's hiring decision "is reasonably attributable to an honest even though partially subjective evaluation of . . . qualifications." *Byrnie*, 243 F.3d at 105; *see Haughton v. Town of Cromwell*, No. 19-CV-359 (MPS), 2021 WL 4248858, at *6 (D. Conn. Sep. 17, 2021) ("Employers may use interview performance as a deciding factor in an employment decision."). And even if the interview scores are set aside, Orelli offers several other legitimate, non-discriminatory reasons for promoting Sean Cavanagh over plaintiffs.

Finally, plaintiffs seek to cast doubt on Orelli's proffered reasons by pointing out that Sean Cavanagh was disciplined for sexual harassment after distributing inappropriate literature at work. Pls.' Statement ¶ 53; Mem. in Opp'n 8–9. Although defendants do not contest Sean Cavanagh's disciplinary history, they argue that any statements about it are inadmissible hearsay. Defs.' Resp. to Pls.' Rule 56.1 Counterstatement ("Defs.' Response") ¶ 53 (Dkt. #75-1). Assuming *arguendo* the Court can consider Sean Cavanagh's disciplinary history, it still does not render plaintiffs "so superior" to Sean Cavanagh that "no reasonable person, in the exercise of impartial judgment, could have chosen" him over them for the job. *Byrnie*, 243 F.3d at 103 (citation omitted). Orelli appears to have faced a decision between promoting, on the one hand, a white man with strong interview scores, six months of experience in the LCL-4 role, knowledge, skills, and personality traits that he believed were well suited to the job, and a personnel file that contained positive letters and training materials, but also a reprimand for sexual harassment; and, on the other hand, one of two African American men or one African American woman with weaker interview scores, less experience in the LCL-4 role, personality traits (as to Shanahan and Green) that he believed were not well suited to the job, no positive letters or training materials, and imperfect histories of their own. Under those circumstances, in which no candidate's strengths and weaknesses clearly

outweighed another's, "the court must respect the employer's unfettered discretion to choose among qualified candidates." *Ibid.* (citation omitted); *Burdine*, 450 U.S. at 259 ("[T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria."); *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) ("While we must ensure that employers do not act in a discriminatory fashion, we do 'not sit as a super-personnel department that reexamines an entity's business decisions.'" (citation omitted)).

**B. Retaliation**

Plaintiffs also allege that the individual defendants retaliated against them for complaining about discrimination, in violation of the Fourteenth Amendment via 42 U.S.C. § 1983. The individual defendants are entitled to summary judgment on those claims.

Plaintiffs' brief in opposition to summary judgment defends plaintiffs' retaliation claim on three theories: (1) that defendants removed Green from the LCL-4 role after thirty days in 2022 because he filed this lawsuit; (2) that defendants declined to promote Shanahan to the LCL-4 role in 2022 because she filed a grievance in 2019; and (3) that defendants transferred two men to the Oakwood Yard and then removed Pearsall from the acting LCL-2 role in 2022 because Pearsall filed this lawsuit, and also because he complained to Town of Huntington elected officials by email in 2019. Mem. in Opp'n 18–25. To the extent defendants retaliated against plaintiffs on any other occasions, plaintiffs have abandoned their claims as to those incidents. *See Dynamic Concepts, Inc.*, 716 F. App'x at 14 (2d Cir. 2017). Any retaliation claims that accrued prior to December 23, 2018 are also barred by the applicable statute of limitations. *See Patterson*, 375 F.3d at 225.

Courts evaluate retaliation claims brought under the Fourteenth Amendment using the *McDonnell-Douglas* burden-shifting framework. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015). At the first step, "the plaintiff must establish a *prima facie* case of

retaliation by showing 1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (citation and quotation marks omitted). "Once a plaintiff meets this initial burden, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for the [adverse employment action]." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010). "If defendant does so, the burden returns to the plaintiff to show that the real reason for plaintiff's [adverse employment action] was his [protected activity]." *Ibid.*

**1. Green**

Green fails to establish a *prima facie* case of retaliation against any individual defendant because he has not shown a causal connection between the filing of this lawsuit in 2021 and his removal from the LCL-4 role in 2022.

"A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Littlejohn*, 795 F.3d at 319 (citation omitted). But an inference of retaliation is undercut when protected activity was followed by a promotion or pay raise—with the adverse action at issue coming only at some later date. *See, e.g.*, *Ronen v. RedRoute, Inc.*, 763 F. Supp. 3d 319, 335 (E.D.N.Y. 2025) (rejecting a proposed causal connection because "in the period between Ronen's protected activity and his firing, Ronen received a raise and additional work responsibilities"); *Rivera v. Greater Hudson Valley Health Sys.*, No. 21-CV-1324 (NSR), 2023 WL 2588308, at *17 (S.D.N.Y. Mar. 21, 2023) (same because of a "subsequent promotion

following Plaintiff's May 2019 complaint"); *Byrne v. Telesector Res. Grp., Inc.*, No. 04-CV-76S (WMS), 2007 WL 962929, at *12 (W.D.N.Y. Mar. 29, 2007) ("Byrne's EEOC filing was most closely followed, on August 17, 2003, by her promotion . . . and a related pay increase . . . [which] alone is sufficient to break the causal link in Byrne's claim that Verizon retaliatorily sought to deny her promotional opportunities."); *Cuttino v. Genesis Health Ventures, Inc.*, No. 04-CV-575 (MRK), 2006 WL 62833, at *8 (D. Conn. Jan. 11, 2006) ("Ms. Cuttino's retaliation accusation is particularly unpersuasive in view of the fact that following two of her earlier complaints about unequal pay, in April 1999 and sometime thereafter, Ms. Cuttino was given multiple pay raises by Ms. Albert-Smith."); *see also Brady v. Hous. Indep. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997) (holding that supervisors' giving plaintiff "positive evaluations and twice recommend[ing] that she be promoted" following protected activity was "utterly inconsistent with an inference of retaliation").

Green relies on temporal proximity to show a causal connection between the filing of this lawsuit and his removal from the LCL-4 role. But this lawsuit was filed on December 23, 2021, Green was elevated from his LCL-3 position to the LCL-4 position around February 2022, and Green was removed from the LCL-4 position approximately thirty days later. Whether the LCL-4 position was temporary or permanent, Green thus received additional work responsibilities and higher pay *after* the filing of this lawsuit and *before* the proposed adverse action. That series of events is "utterly inconsistent" with a temporal inference that defendants retaliated against Green for his protected activity. *Brady*, 113 F.3d at 1424. And Green has not put forward evidence other than temporal proximity that could support an inference of a causal connection.

Green argues that it was Sorrentino who gave him the LCL-4 position and that it was Baisley and Smyth who caused it to be taken away, which could support a temporal inference as

to Baisley and Smyth alone. *See* Ex. M at 170; SAC ¶¶ 124, 130; Pls.' Response ¶ 187; Pls.' Statement ¶¶ 32, 49. Defendants object that the evidence supporting the proposition that Baisley and Smyth caused the position to be taken away is inadmissible hearsay. Defs.' Response ¶¶ 32, 49. Even if the Court could consider it, however, it would not be enough to sustain Green's retaliation claim. At the second step of the *McDonnell-Douglas* framework, defendants have offered legitimate nondiscriminatory reasons why Green was removed from the position: Sorrentino believed Green's "performance in the LCL-4 position was unsatisfactory" and also "decided not to fill the LCL-4 position" moving forward "[b]ased upon the operational needs of the Highway Department, as well as budgetary constraints." Mem. in Supp. 27–28. Green offers no evidence at the third step of the *McDonell-Douglas* framework that that those reasons are pretextual. He hints that Sorrentino's explanations are "inconsistent or shifting," Mem. in Opp'n 25, but the two explanations contained within the statement above are consistent with each other, and Green does not point to any other statements in the record about the reason he was removed from the LCL-4 position, *see Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001) (finding no evidence of pretext where an employer's explanations are "variations . . . on the same theme rather than separate inconsistent justifications"); *Warren v. N. Shore Univ. Hosp. at Forest Hills*, No. 03-CV-19 (DGT) (RML), 2006 WL 2844259, at *10 (E.D.N.Y. Sep. 29, 2006) (concluding that "plaintiff has failed to create a jury question on the issue of pretext" where "[t]he multiple reasons defendant raised for not hiring plaintiff are not conflicting, but complementary"). Accordingly, Green has not put forward evidence that would satisfy his burden at the third step.

**2. Shanahan**

Shanahan fails to establish a *prima facie* case of retaliation against any individual defendant because she has not shown a causal connection between the grievance she filed in 2019 and her rejection for the LCL-4 role in 2022.

Shanahan, like Green, relies principally on temporal proximity to show a causal connection between the two. Although the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Littlejohn*, 795 F.3d at 319 (citation omitted), "[g]enerally, courts have found that a time period of one year between the protected activity and the alleged retaliatory act is too attenuated," *McKinney v. Dep't of Transp.*, 168 F. Supp. 3d 416, 426 (D. Conn. 2016). Shanahan's rejection came more than two years after she filed the grievance and approximately two years after the grievance was finally denied. That distance in time is too great, on its own, to suggest a causal connection.

Shanahan also argues that a causal connection can be inferred because she "was the most senior and qualified candidate aside[] from Plaintiff Green, however she was not offered the promotion." Mem. in Opp'n 19. But regardless of whether the LCL-4 role made available in 2022 was a temporary or permanent one, it was Green who received it. Shanahan thus concedes that a candidate more senior and qualified than her received the promotion, thereby defeating the inference she seeks to draw. And she does not allege other facts to plausibly suggest "retaliatory animus," such as "negative comments by supervisors" or "admission[s] by the decisionmaker[s] that [they] . . . made a decision by relying on an improper consideration." *Tenemille v. Town of Ramapo*, No. 18-CV-724, 2020 WL 5731964, at *12 (S.D.N.Y. Sept. 24, 2020). Accordingly, Green has not put forward evidence from which a reasonable jury could conclude there was a causal connection between her grievance and her rejection.

**3. Pearsall**

Pearsall fails to establish a *prima facie* case of retaliation against any individual defendant because he has not shown a causal connection between either his June 2019 email to Town of Huntington elected officials or the filing of this lawsuit in December 2021 on the one hand, and the events that occurred at the Oakwood Yard in March 2022 on the other.

Like Green and Shanahan, Pearsall relies primarily on temporal proximity. But as discussed above, inferences of causal connection drawn from temporal proximity are ordinarily defeated by a lapse of more than a year, *McKinney*, 168 F. Supp. 3d at 426, and also by a promotion and pay raise that occurred between the protected activity and the adverse action, *Ronen*, 763 F. Supp. 3d at 335. Here, Pearsall was removed from his temporary LCL-2 position at the Oakwood Yard 33 months after he sent the email, and he was *given* the temporary LCL-2 position after both sending the email and filing this lawsuit. In light of those undisputed facts, no causal connection can be drawn on the basis of temporal proximity.

In addition to temporal proximity, the other argument he offers is that "other employees . . . who did not engage in protected activity were treated more favorably in similar circumstances." Mem. in Opp'n 23. In support of that argument, plaintiffs' brief cites Pearsall's deposition and lists "Jeff Gracey, Mike Newman, Jeff Coleman, Mike Dennis, Thomas Fedaruso, [and] Pat Maisch" as examples. *Ibid.* (citing Ex. O at 131). But the relevant statement in Pearsall's deposition is that those employees received tree trimmer positions, not that those employees received LCL-2 positions. *See* Ex. O at 131. His deposition also contains no statements about whether those employees submitted grievances or complaints or otherwise engaged in protected activity. *See generally* Ex. O. The brief thus points to no factual support for its assertion that those employees are comparators, and the Court is not aware of any factual support for that assertion elsewhere in the record. Although a causal connection in a retaliation claim may be

shown through "evidence such as disparate treatment of fellow employees who engaged in similar conduct," *Littlejohn*, 795 F.3d at 319 (citation omitted), "the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000); *see Monplaisir v. City of New York*, No. 24-CV-1882 (LJL), 2026 WL 2475147, at *14 (S.D.N.Y. Aug. 24, 2026) ("An employee of markedly different rank generally cannot serve as an appropriate comparator."). Pearsall has not presented no evidence to that effect. As a result, no causal connection can be drawn on that basis.

Finally, Pearsall appears to allege that his June 2019 email is the reason his cousin received a promotion instead of him on an *earlier* occasion. The SAC alleges, for example, both that the promotion of Pearsall's cousin "prompted" Pearsall to send an email to Town of Huntington elected officials, and also that the promotion of his cousin "was an act of retaliation." SAC ¶ 180; *see* Ex. R (referring, in the email, to Pearsall's cousin being promoted instead of him); Mem. in Opp'n 21 (alleging Pearsall was "passed over" for the promotion because he sent the email). That allegation has no merit because the email could not have caused an event that already occurred. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where . . . adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

### C. Hostile Work Environment

In plaintiffs' brief in opposition to summary judgment, Green seeks to bring a Title VII hostile-work-environment claim against Orelli and Thomas Cavanagh. *See* Mem. in Opp'n 25–26. The Court declines to consider this claim because a brief in opposition to summary judgment is ordinarily not an appropriate forum in which to raise a new claim, *see Greenidge v. Allstate Ins.*

*Co.*, 446 F.3d 356, 361 (2d Cir. 2006), and there are no special circumstances here that would justify departing from that rule.

"[T]he central purpose of a complaint is to provide the defendant with notice of the claims asserted against it." *Ibid.* "[A] party cannot amend their complaint simply by alleging new facts and theories in their memoranda opposing summary judgment." *Caro Cap., LLC v. Koch*, 653 F. Supp. 3d 108, 120 (S.D.N.Y. 2023) (citation omitted); *see George v. Reisdorf Bros., Inc.*, 410 F. App'x 382, 384 n.2 (2d Cir. 2011) (affirming "[t]he district court's refusal to consider this claim, raised for the first time in the plaintiffs' papers opposing the defendant's motion for summary judgment"); *Comerford v. Village of N. Syracuse*, No. 18-CV-1143 (BKS) (TWD), 2021 WL 950974, at *27 (N.D.N.Y. Mar. 12, 2021) ("Courts have repeatedly held that it is improper to consider claims not asserted in the complaint and raised for the first time at the summary judgment stage.") (collecting cases). Here, plaintiffs already amended their complaint twice, each time after receiving notice of arguments by defendants for dismissal. *See* Compl.; Mot. for Pre-Mot. Conf. (Dkt. #9); Am. Compl.; Mot. for Pre-Mot. Conf. (Dkt. #18); SAC. None of those complaints included a hostile-work-environment claim under Title VII or any other law. Nor have defendants requested leave to amend their second amended complaint to add such a claim. Accordingly, the Court declines to consider it.

## II. Town of Huntington

Plaintiffs' remaining claim seeks to hold the Town of Huntington liable under *Monell* for alleged policies or customs that permit discrimination. But "*Monell* does not provide a separate cause of action for the failure by the government to [implement policies or] train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v.*

*City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). "In other words, a *Monell* claim cannot succeed without an independent constitutional violation." *Anilao v. Spota*, 27 F.4th 855, 874 (2d Cir. 2022). Since defendants are entitled to summary judgment on all claims alleging independent constitutional violations, they are also entitled to summary judgment on the *Monell* claim. *See Segal*, 459 F.3d at 219 (concluding, at summary judgment, that "[b]ecause the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct"); *Davis-Guider v. City of Troy*, No. 23-589, 2024 WL 5199294, at *3 (2d Cir. Dec. 23, 2024) (summary order) (concluding, at summary judgment, that "[b]ecause we conclude that the district court correctly dismissed [the underlying] claims, it was also correct to reject his municipal liability . . . claims").

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: September 30, 2026
Brooklyn, New York